## Case No. 13,363.

### The STEPHEN HART.

[Blatchf. Pr. Cas. 379.] [1]

District Court, S. D. New York.  July 30, 1863.

PRIZE — ATTEMPT TO VIOLATE BLOCKADE — CONTRABAND GOODS.

1. Vessel and cargo condemned because, at the time of her seizure, the vessel was laden with and transporting articles contraband of war, with intent to furnish and supply them to the use and the aid of the enemy.

[Cited in The Springbok, Case No. 13,264.]

2. She was, when seized, navigated with the attempt and design to violate the blockade of ports of the enemy held in lawful blockade by the naval forces of the United States.

[Cited in The Peterhoff, Case No. 11,024.]

In admiralty.

## Case No. 13,364.

### The STEPHEN HART.

[Blatchf. Pr. Cas. 387; [1] Betts, Pr. Cas.]

District Court, S. D. New York.  July 30, 1863.[2]

PRIZE — ATTEMPT TO VIOLATE BLOCKADE — CONTRABAND GOODS.

1. In this case the cargo of the prize vessel, consisting wholly of articles contraband of war, was unladen and inventoried and appraised, and reported to the court, before the hearing. Nearly all of the cargo was delivered to the government, for its use, at the appraised value. The court, on the application of the libellants, permitted the cook of the vessel, and one of the witnesses, to be re-examined on one of the standing interrogatories, it appearing from his affidavit that he did not fully answer that interrogatory in relation to certain papers on board, although he had testified to the omitted facts on an examination made of him on board of the capturing vessel.

2. The court, on the application of the libellants, permitted the first mate of the vessel, one of the witnesses, to be re-examined on the standing interrogatories, it appearing from his affidavit that he had the virtual control of the vessel on her voyage, and had, on his examination, not disclosed the truth as to the true destination of the vessel and cargo.

3. The question of the admissibility of depositions given on the re-examination of persons found on board of a capturing vessel is one resting in the sound discretion of the court.

4. If, in this suit, the case, upon the depositions as originally taken, without the re-examination of the two witnesses, were a clear one in favor of the claimants, and free from all doubt, the court would hesitate, perhaps, to admit the re-examination.

5. A prize case is, in the first instance, to be tried on evidence coming from the captured. If, upon such evidence, no doubt arises, the property is to be restored; and the privilege, on the part of the captors, of giving further proofs is, in such cases, rarely granted.

6. Within these principles, the court has endeavored, in all proper cases, to exhaust the knowledge of the person found on board of captured vessels.

7. The instructions of the navy department of the United States to the naval commanders of the United States, of August 18, 1862, that

[1] [Reported by Samuel Blatchford, Esq.]

[1] [Reported by Samuel Blatchford, Esq.]
[2] [Affirmed in 3 Wall. (70 U. S.) 559.]

the vessel is not to be seized "without a search carefully made, so far as to render it reasonable to believe that she was engaged in carrying contraband of war for or to the insurgents, and to their ports directly, or indirectly by transshipment, or otherwise violating the blockade," are in accordance with settled public law.

8. The views of the members of the government of Great Britain as to the administration of prize law by the courts of the United States during the present war, as to the belligerent right of search, as to violation of the blockade, and as to the carrying of articles contraband of war, stated.

9. The course of trade during the present war, in regard to running the blockade from neutral ports in the vicinity of the enemy's country, commented on.

10. The question whether or not property laden on board of a neutral vessel was being transported in the business of lawful commerce is not to be decided by merely deciding the question as to whether the vessel was documented for and sailing upon a voyage between two neutral ports.

11. The commerce is in the destination and intended use of the property laden on board of the vessel, and not in the incidental, ancillary, and temporary voyage of the vessel, which may be but one of many carriers through which the property is to reach its true and original destination.

12. Nor is the unlawfulness of the transportation of contraband goods determined by deciding the question as to whether their immediate destination was to a port of the enemy.

13. The proper test to be applied is whether the contraband goods are intended for sale or consumption in the neutral market, or whether the direct and intended object of their transportation is to supply the enemy with them. To justify the capture it is enough that the immediate object of the voyage is to supply the enemy, and that the contraband property is certainly destined to his immediate use.

14. If a contraband cargo is really designed, when it leaves its neutral port of departure, for the use of the enemy in the country of the enemy, and not for sale or consumption in a neutral port, no principle of the law of nations, and no consideration of the rights and interests of lawful neutral commerce, can require that the mere touching at such neutral port, either for the purpose of making it a new point of departure for the vessel to the port of the enemy, or for the purpose of transshipping the contraband cargo into another vessel, which may carry it to the destination which was intended for it when it left its port of departure, should exempt the vessel or the contraband cargo from capture as prize of war.

15. The division of a continuous transportation of contraband goods into several intermediate transportations, by means of intermediate voyages by different vessels carrying such goods, cannot make a transportation which is, in fact, a unit, to become several transportations, although, to effect the entire transportation of the goods requires several voyages by different vessels, each of which may, in a certain sense and for certain purposes, be said to have its own voyage, and although each of such voyages, except the last one in the circuit, may be between neutral ports. Nor can such a transaction make any of the parts of the entire transportation of the contraband cargo a lawful transportation, when the transportation would not have been lawful if it had not been thus divided.

16. The inception of the voyage completes the offence. From the moment that the vessel with the contraband articles on board quits her port on the hostile destination, she may be le-

gally captured. It is not necessary to wait until the ship and goods are actually endeavoring to enter the enemy's port. The voyage being illegal at its commencement, the penalty immediately attaches, and continues to the end of the voyage, at least so long as the illegality exists.

17. Where it is claimed that an enemy vessel has been transferred during the war to a neutral, competent proof of the transfer must be produced, or the vessel will be regarded as enemy property.

18. The registry of the vessel in the name of the neutral claimant as owner is not enough. The bill of sale of the vessel must be proved, or the payment of the consideration for the transfer.

19. Where enemy property is transferred to a neutral residing at the time in the enemy's country, the property is still regarded as enemy property.

20. In this case it was *held* that the claimant of the vessel had given up the entire control of her movements to the owners of her cargo, and had involved her in any illegality of which they or her master had been guilty in respect to the cargo.

21. The letters of instruction found on board of the vessel, and the absence of any manifest, bills of lading, or invoices, commented on as affecting the question of the destination of her cargo.

22. The test oaths to the claims commented on as affecting the same question.

23. The vessel had on board a flag of the enemy, which was secretly thrown overboard after her capture.

24. Alleged ignorance of her master as to her having on board articles contraband of war.

25. Letters of instruction not delivered up by the master to the prize master at the time of capture, but only produced by him on his examination on the standing interrogatories.

26. Attempted suppression, by the first officer of the vessel, of letters showing an intention to violate the blockade.

27. The spoliation of papers is a strong circumstance of suspicion. It is not, however, either in England or in the United States, *held* to furnish, of itself, sufficient ground for condemnation, but is a circumstance open to explanation. But if the explanation be not prompt and frank, or be weak or futile, if the cause labors under heavy suspicions, or if there be a vehement presumption of bad faith or gross prevarication, it is ground for the denial of further proof, and the condemnation ensues from defects in the evidence which the party is not permitted to supply.

28. *Held*, on the evidence, that the cargo of the vessel was intended, on its departure from England, to be carried into the enemy's country for the use of the enemy, by a violation of the blockade of some one of the enemy's ports, either in that vessel or in another vessel into which the cargo was to be transshipped, for the purpose of being transported by sea to the enemy's country.

29. *Held*, also, that the claimant of the vessel was, under the circumstances of this case, responsible for the use to which the master and the claimants of the cargo put the vessel, namely, the carrying, for a portion of the distance on its way to the enemy's country, of a cargo contraband of war, intended for the use of the enemy, and to enter the enemy's port, by a violation of the blockade.

30. The carriage of contraband with a false destination works a condemnation of the vessel as well as the cargo.

31. Vessel and cargo condemned for an attempt to introduce contraband goods into the enemy's country by a breach of blockade.

In admiralty.

BETTS, District Judge. The schooner Stephen Hart was captured, as lawful prize of war, by the United States vessel of war Supply, on the 29th of January, 1862, in latitude 24° 12' north, and longitude 82° 14' west, off the southern coast of Florida, about 25 miles from Key West, and about 82 miles from Point de Yeacos, in Cuba, and was sent to the port of New York for adjudication, under convoy of her captor. A libel was filed against her in this court on the 18th of February, 1862. On the 1st of May, 1862, a claim to the vessel was interposed by John Myer Harris, of Liverpool, England, as her sole owner. The test oath to that claim was made by Charles N. Dyett, the master of the schooner. On the same day, a claim was put in to the whole of the cargo of the schooner, by Samuel Isaac, on behalf of himself and Saul Isaac, as copartners and subjects of Great Britain, doing business in England under the firm name of S. Isaac, Campbell & Co., and claiming to be the sole owners of the cargo. The test oath to that claim was made by Samuel Isaac. On the 25th of October, 1862, another claim to the schooner on behalf of Harris was interposed. In this second claim Harris is described as late of Liverpool, England, but now of Sherbro', on the western coast of Africa, at present residing in England, merchant. This second claim sets up that he is the sole owner of the schooner, and is a subject of the crown of Great Britain.

In the test oath to the second claim of Harris, and which test oath is made by him, it is alleged that, on the 28th of September, 1861, he agreed to become the purchaser of the schooner for £1,750, to be paid October 28, 1861; that it was afterwards arranged that the money should be paid on the 14th of October; that an abatement of £5. 10s. 3d. was thereupon made from the purchase money; that the balance of £1,744. 9s. 9d. was paid; that the vessel was at Bristol, England, at the time of her sale; that, after such purchase, she took a cargo from Bristol to London, and was then loaded partly at London and partly at Erith, with a cargo of arms, ammunition, and military clothing; and that such cargo was the sole property of S. Isaac, Campbell & Co. It is to be noted that this test oath does not state from whom he purchased the schooner, or to whom he paid the money, or whether he received any bill of sale. It is also silent as to any hiring or charter of the vessel to S. Isaac, Campbell & Co. It states that the vessel "cleared for the port of Cardenas"; that it was not intended that she should "enter, or attempt to enter, any port of the United States"; that "her true and only destination with said cargo was Cardenas, where the same was to be delivered"; that the vessel was thence to sail to the claimant in Africa, if she obtained a suitable cargo for that country; and that the vessel and her cargo are British property.

The test oath of Samuel Isaac to the claim on behalf of S. Isaac, Campbell & Co. to the whole of the cargo, alleges that the cargo was shipped by that firm, consisting of himself and Saul Isaac, on or about December 2, 1861, partly at London and partly at Erith; that the vessel was bound for Cardenas, in the island of Cuba; that the cargo consisted of arms, ammunition, and military clothing, and is wholly the property of that firm; that its members are British subjects; that the vessel cleared for Cardenas; that the cargo was destined for Cardenas; that it was not intended that the vessel should "enter, or attempt to enter, any port of the United States, or that the cargo should be delivered at any port in the United States"; and that "the true and only destination was Cardenas, where the same was to be delivered, and the vessel was thence to sail to Africa, if she obtained a suitable cargo for that country." It does not set up any charter of the vessel.

The testimony in preparatorio, consisting of the depositions of Charles N. Dyett (the master), Benjamin H. Chadwick (the first mate), John Leisk (the cook and steward), Charles Nellman (the second mate), and Robert Allan (an able seaman), was taken in February, 1862. The case was not submitted to the judgment of the court until the term of July, 1863. It was suggested at the hearing, in excuse of what seemed to be the great delay in the case, that such delay was owing to the pendency before the supreme court of the United States, on appeal, until March last, of various prize suits, which it was supposed might dispose of material questions involved in this case. But, from such report of the decisions in those cases as this court has been furnished with, it does not appear that the main questions involved in the present case have been determined by the supreme court in any of the cases alluded to.

Various interlocutory proceedings took place in the present case, a reference to some of which is necessary.

Before the filing of the libel, and on the 14th of February, 1862, this court ordered that so much of the cargo of the schooner as consisted of arms, powder, and munitions of war should be placed in the custody of the commandant of the navy yard at New York, and that the prize commissioners should make a full inventory of all the articles delivered to the commandant, and that they should be appraised, and the appraisement be filed with the inventory. In pursuance of this order, the appraiser appointed by the court, Mr. Orison Blunt, discharged the cargo of the schooner, and stored it in the ordnance stores at the navy yard. In his report, which was filed on the 25th of March, 1862, he states that, in unloading the vessel, he did not have the benefit of any

invoice; that he took an accurate account of every case, box, and bale, and· of their numbers and marks; that the vessel was stowed with great care, and the bales and cases pressed in with jackscrews, which made great precaution necessary in taking them out, for fear of an explosion of some of the ammunition or loaded shells; that, upon opening the afterhatch and taking out some of the cases, he discovered some four tons of powder, and also 1,008 loaded shell, with percussion primers affixed, and some 600,000 ball cartridges, or fixed ammunition for small arms, which were all removed and placed in the magazines of the navy yard; that, after all the cargo had been placed in the ordnance stores without any loss or damage, he opened every entire case and bale, and inspected and counted accurately every article, and found them to be all in good condition, and that every article was of value for use in the army and navy of the United States, except a large quantity of "Rebel buttons," manufactured in Great Britain, and stamped with a "Rebel device." The appraiser annexed to his report a catalogue of the cargo and his appraisement of each article. The following articles appear to have constituted the cargo of the vessel; 5,740 long Enfield rifles, with triangular bayonets; 1,260 short Enfield rifles, with saber bayonets; 660 rifled Enfield carbines, with saber bayonets; 2,640 British rifled muskets, with triangular bayonets; 200 British smooth-bore muskets, with triangular bayonets; 320 Brunswick rifles, with saber bayonets; 375 cavalry sabers; 6,800 gray blankets; 1,750 white blankets; 4 of Blakeley's 2¾-inch bore rifled cannon (six-pounders), with 2,000 cartridge bags and 1,008 shell for the same, loaded and capped; 120,000 cartridges, fixed ammunition for Enfield rifles; 100,000 percussion· caps; 2,160 cartridge boxes; 4,095 knapsacks; 4,000 ball bags and belts; 100,000 Brunswick rifle cartridges; 410 minie rifle cartridges; 5,000 cartridges for smooth-bore English muskets, each cartridge consisting of a round ball and two buckshot; 1,540 yards of gray army cloth; 11,453 yards of steel mixed gray army cloth for uniforms; 625 gross of brass buttons "for infantry, artillery, and cavalry, for the Rebel army, marked 'C. S. A.'"; 15,432 pairs of stockings; 2,000 pairs of brogan shoes; 592 pairs of russet shoes, Blucher pattern; 762 pairs of black leather shoes, Blucher pattern; 2,220 waterproof covers for mess tins; 17 cases and 3 bales of trimmings for army clothes and uniforms, consisting of linings, cord, braid, lace, thread, buckram, etc.; 109 yards of scarlet cloth for army uniforms; 7,500 yards of white twilled flannel for lining for army overcoats; 2,250 yards of brown holland for the same purpose; 1,040 gross of buttons for army uniforms and clothing; 7,800 pounds of cannon powder; and a considerable quantity of cartridge paper, cones, and other appurtenances for small arms, gun slings, medicine, lint, bayonet scabbards, surgeons' equipments, scissors, thimbles, hooks and eyes, shears, canvas lining, alpaca, and tarpaulins. The appraisement of the entire cargo was $238,945.37.

Under orders of this court of the 3d of March and 16th of April, 1862, the Enfield rifles and certain other articles found on board of the schooner were delivered to the navy department for the use of the United States, at the appraised value of $169,467.50. By another order of the court, made March 4, 1862, another portion of the cargo, amounting to the appraised value of $14,196.11, was delivered to the war department, the ordnance department, and the sanitary department, for the use of the United States. Under an order of this court, made on the 7th of May, 1862, the schooner and the remainder of her cargo, which remainder amounted, at its appraised value, to $55,281.76, were sold at public auction. The vessel was sold for $10,000. The proceeds of the vessel and her cargo, including the amount paid by the navy and war departments for the articles taken by them, were paid into the registry of the court.

After the cook and steward, John Leisk, had been examined on the 13th of February, 1862, an affidavit made by him on the 25th of February, 1862, was presented to the court, in which he stated that, in giving his testimony before the prize commissioners, he did not fully answer the thirty-second interrogatory in relation to certain papers on board, and their description, and what was said on their being discovered, although he has testified to those facts on an examination made of him on board of the capturing vessel. An order was thereupon made by the court, on the same day, on the motion of the district attorney, that the thirty-second standing interrogatory be propounded anew to the witness Leisk, and that his additional answer thereto be received and added to his deposition, with the like force and effect as if the same had been taken at the time of his original examination. On the same day that interrogatory was again propounded to him, and his further answer thereto forms part of the depositions in preparatorio.

On the 24th of October, 1862, the court, on the motion of the district attorney, made an order that Benjamin H. Chadwick, the first mate, who had been examined in preparatorio, on the standing interrogatories, on the 13th of February, 1862, should be again examined by the prize commissioners on the standing interrogatories, and that the question of the admissibility of his evidence so to be given should stand over for future determination. This order was founded upon an affidavit made by Chadwick on the 21st of October, 1862, in which he stated that he was one of the persons captured on the Stephen Hart, and was entered upon her shipping articles as her first mate, although, in fact, he was intrusted with the virtual con-

trol; that he had examined a copy of his testimony given by him on his examination on the 13th of February, 1862, and found that his answers to the eleventh, thirty-sixth, and thirty-ninth interrogatories, as well as to any other which asked for the true destination of the vessel and her cargo on the voyage on which she was captured were imperfect, and did not disclose the entire truth in relation to the subject-matter inquired of; and that he desired the privilege of correcting the same on a re-examination, by stating that he well knew that the real destination of the cargo of the vessel, if not of the vessel herself, was one of the blockaded "Confederate ports of the Southern States," and that the port of Cardenas, in Cuba, was to be used simply as an intermediate port of call and of transshipment of the cargo, if it was there determined by Charles J. Helm, an agent there of the "Confederate States," whose instructions the witness was directed to follow, that the cargo should be transshipped into a steamer, which could with greater facility be used in running the blockade; that the witness was employed for that purpose by reason of his knowledge of the Southern coast, and of the navigation of the blockaded ports and harbors, and was so employed after his examination specially on that point at the countinghouse of S. Isaac, Campbell & Co., the owners of the cargo, in London, where, at the time, were William L. Yancey and other persons interested in the "Southern Insurrection"; that he, the witness, had been in no manner influenced to make such disclosure by the libellants or the captors, or any one in any manner connected with either of them, but had been induced to do so solely by the persuasions of his wife, who was a loyal woman then residing in Boston, and whose just reproaches had caused him to regret that he had ever lent his aid to such a cause, and to determine, as far as he could, to atone for whatever mischief he might have done. Upon the hearing of the motion for the further examination of Chadwick, the application was opposed by the claimants of the cargo, upon an affidavit, made by Chadwick on the 6th of May, 1862, in which he stated that certain letters and papers belonging to him were seized by the captors, and retained by them until the 28th of April, 1862, when, without any application to the court, a portion of them were taken from the rest of the papers seized on board of the schooner and handed over to him by Mr. Elliott, one of the prize commissioners; that the letters so handed to him were a part of the letters mentioned in the examination in preparatorio of John Leisk and stated by Leisk to have been placed by him in a teapot at the request of Chadwick, and to have been afterwards discovered by the crew of the capturing vessel. The court was subsequently furnished with an affidavit made by Mr. Elliott in which he stated that, after the arrival of the schooner at New York, one of the officers in charge of her placed in his hands some letters which he represented to be private papers belonging to Chadwick; that those letters were not presented by the prize-master as a part of the papers seized with the schooner as her papers, but as private letters belonging to Chadwick; that, under the advice of the assistant district attorney, and at the request and with the consent of Chadwick, the deponent carefully read the letters, and found them to be only private letters to Chadwick from his wife, and that there was not in them one word relating to the schooner, or her cargo, or her voyage, or her destination; and that thereupon, on the further advice of the assistant district attorney, the letters were handed to Chadwick as his private property, several months before his re-examination, and with no reference thereto, and with no knowledge or suspicion that any such re-examination would ever occur.

There were found on board of the schooner, at the time of her capture, her register and sundry bills, certificates, telegrams and letters, a clearance, two log books, a copy of the United States Coast Survey for 1856, and sundry other papers, but no invoices, no bills of lading and no manifest. The register of the schooner is dated at Liverpool, England, October 15, 1861. It represents her as having been built at Greenport, in the state of New York, in the United States, in the year 1859, and her foreign name as having been "Tamaulipas." Her tonnage is stated at 219.85 tons. Her owner is stated to be John Myer Harris, of Liverpool, merchant. The register contains the following printed memorandum at its foot: "Notice. A certificate of registry granted under the merchant shipping act of 1854 is not a document of title." On the back of the register is indorsed a certificate, made at the customhouse in London, on the 15th November, 1861, stating that Charles N. Dyett had that day been appointed master of the schooner. There were also found on board of the schooner a letter, signed "R. H. Leonard, ship Alexander, Confederate States," dated at Bristol, England, October 29, 1861, and addressed to Chadwick; and a letter from Leonard, addressed "to Mr. B. H. Chadwick, alias Tommy, first officer Stephen Hart," purporting to be written at Bristol, England, but without date; and a letter signed "John Johnson, ship Naomi, care J. P. Snell & Co., Bristol, England," and addressed "Mr. Benjamin H. Chadwick, schooner Stephen Hart, Surrey Canal, London," and dated at Bristol, England, October 29, 1861. The contents of these three letters will hereafter be specially referred to. By sundry certificates found on board of the schooner, it appears that she cleared from London, on the 19th of November, 1861, for Cuba, generally, neither the port of Cardenas, nor any other port in Cuba, being mentioned as her destination in any of her regular papers. There was also found on board of the schooner a letter in the following words: "71 Jermyn street, London, S. W., November, 19, 1861. J. Crawford, Esq're, H. M. Consul General, Havana—Dear Sir: In confirmation of my last, permit me to ask your assistance and advice for

Capt. Dyett, of the schooner 'Stephen Hart,' should he need it during his stay at Havana. Permit me to be yours, most faithfully, Saul Isaac." There was also found on board of the schooner a telegram from S. Isaac, Campbell & Co., 71 Jermyn street, London, to Lloyd's agent at Deal, received at Deal November 23, 1861, in the following words: "Please detain schooner Stephen Hart, bound for Cardenas, for orders. We pay all expenses. Reply per telegraph. Letter per post." There was also found a letter, dated "London, Nov. 22, 1861," in the following words: "Captain Dyett, Schooner Stephen Hart—Dear Sir: We require some matters arranged before the schooner leaves. You will receive this per Lloyd's agent. Attend to the orders, and wait until you hear from yours, truly, S. Isaac, Campbell & Co." There was also found another telegram from S. Isaac, Jermyn street, London, to Lloyd's agent, at Deal, received at Deal November 24, 1861, in the following words: "Capt. Dyett will proceed on his voyage at once, and make up for lost time. Wish him a successful trip."

The shipping articles of the crew of the schooner, found on board, are dated November 16, 1861, and specify that the voyage is to be "from London to Cuba and Sierra Leone, and any port $^{and}_{or}$ ports on coast of Africa, $^{and}_{or}$ North $^{and}_{or}$ South America $^{and}_{or}$ West Indies, and back to a final port of discharge in the United Kingdom. Voyage not to exceed twelve months." On these shipping articles the name of Benjamin H. Chadwick is entered as chief officer, his signature appearing upon them, and he is stated to be an American, aged 29 years, and to have last served on board the vessel called the "Tamaulipas," and to have been discharged therefrom at London, on the 2d of November, 1861. The date of his joining the Stephen Hart is stated as November 1, 1861, although he is placed in a list under the head of "substitution," with two others who were severally stated as joining the vessel November 22 and November 29, and no place is inserted as the place of his joining the vessel, although the place is inserted in the case of the other two substitutes. The wages of Chadwick are put down as £9 per calendar month, the wages of the mate, whose place he took, being stated at £6 per month. In one of the two log books found on board of the vessel, namely, the official log book, the name of Benjamin H. Chadwick appears as mate of the vessel, and no other person is named as mate; and the date of the commencement of the voyage is stated in that log book as November 19, 1861. In the other log book, which is an ordinary sea log book, there appears, under date of November 21, 1861, an entry in the handwriting of Chadwick, by whom that log book purports on its face to have been kept, to the effect that the mate had not come to perform his duty; and the log book then proceeds as follows: "Wherefore I, Benj. H. Chadwick, have this day engaged with Capt. Charles N. Dyett to proceed on the voyage, having been engaged as ship keeper on board since the 2d of the present month, the crew consisting of six seamen, cook and steward, captain, mate, and boatswain,—in all numbering ten persons." The shipping articles show eleven persons, there being seven seamen, one of the seamen, as appears by the official log book, having been shipped at Gravesend on the 22d of November, and discharged because of illness, at Deal, on the 29th of November, and another seaman having been shipped at Deal in his place on the last-named day. The name of one seaman which appears on the shipping articles does not appear on the official log book, and there is a memorandum on the shipping articles that he deserted. This reduces the number of persons composing the crew to ten, including Chadwick.

The entry on the title page of the sea log book is that the schooner was on a voyage from London to Cardenas, Cuba, commencing November 19, 1861, and that the log book is kept by Benjamin H. Chadwick. It appears, from entries in that log book, that the pilot took charge of the schooner "on a voyage to Cuba" on the 19th of November, and that she was on that day "towed by steam from the Grand Surrey dock to Erith, to take in the remainder of cargo," and that she arrived at Erith the same day; that, on the 20th November, she took in from lighters some sixty cases of cargo, and that on the evening of the same day she was towed to Gravesend; that she remained at Gravesend until the 22d of November, when she proceeded down the river, coming to anchor, in the afternoon, off the North Foreland light; that, on the 23d of November, she proceeded to the Downs, where she came to anchor, and where the "captain received instructions from parties in London" to wait until further orders; that, on the 24th of November, she received orders to proceed on her voyage; that she did not start until the 2d of December, her sea log commencing at noon on the 3d of December; that she pursued her voyage through December and January, no particular occurrence being noted until the 15th of January, when she passed 18 miles to the northeast of Desirada Island, one of the Leeward Islands, in the West Indies, and also between the island of Guadaloupe and the island of Montserrat, in the latitude of about 1° 30′ north; that from this point she proceeded to the southward of Hayti and to the northward of the island of Jamaica, passing the latter on the 21st of January, and thence to the southward of Grand Cayman Island on the 23d of January, and thence around the western end of the island of Cuba, making Cape St. Antonio, the extreme western point of that island, at 3:30 p. m. on the 26th of January, and seeing the last of Cape Antonio light, 20 miles distant, bearing south half east, at 10 p. m. of that day, her latitude by observation at

noon on the 27th of January, being 23° 24′ north. There are no entries in the log book after the latter hour.

The "Coast Survey" found on board of the schooner, as before mentioned, is a report from Prof. Bache, superintendent of the United States coast survey, for the year ending November 1, 1856, and contains, among other things, the following charts: A comparative chart of the entrance into Charleston harbor by Maffit's channel; a preliminary chart of the entrance into North Edisto river; a preliminary chart of the seacoast of South Carolina, from Charleston to Tybee, Georgia, with sailing directions; a preliminary chart of St. Simon's bar and Brunswick harbor; a preliminary chart of St. Mary's bar and Fernandina harbor; a comparative chart of the same; two charts of St. John's river; and a preliminary chart of the Florida Reefs. These charts, as folded in the book, have each of them written in pencil, on the outside, the nature of its contents, thus: "Maffit's Channel;" "North Edisto;" "sailing directions for several So. Ca. and Ga. ports;" "St. Simon's;" "Fernandina;" "St. John's river;" "Florida Reefs."

Capt. Dyett, on his examination in preparatorio, produced two letters, which are annexed to his deposition. One of them is a letter of instructions to himself from S. Isaac, Campbell & Co., and is dated "71 Jermyn street, Military Warehouse, late 21 St. James street, London, S. W., November 19, 1861"; and the other is a letter from Saul Isaac to "Charles J. Helm, Esq., care of J. Crawford, Esq., Havana," and is dated "71 Jermyn street, London, November 19, 1861." The contents of these two letters, and the circumstances under which they were produced by Capt. Dyett, will be referred to hereafter.

Before proceeding to a consideration of the merits of the case, it is proper to advert to the objections made to the second examination of the witnesses Leisk and Chadwick. The question of the admissibility of the second deposition of Chadwick was ordered by the court to stand over to be determined at the hearing of the main cause. The question of the admissibility of depositions given on the re-examination of persons found on board of a captured vessel is one resting in the sound discretion of the court, and no authority has been cited which decides that the practice is one that is not to be permitted under circumstances such as existed in the present case. The case of The Pizarro, 2 Wheat. [15 U. S.] 227, is not regarded as an authority against the course pursued in this case. While the court ought to guard the practice with care, lest it may be the means of introducing abuse, and of leading to fraud and imposition, the present case seems, on the fullest consideration, to be one in which the propriety of admitting the re-examination of the witnesses Leisk and Chadwick cannot be questioned. If the case, upon the deposi-tions as originally taken, without the re-examination of the two witnesses, were a clear one in favor of the claimants, and free from all doubt, the court would hesitate, perhaps, to admit the re-examinations. But, upon the testimony without the re-examinations, the case is not only not one free from doubt, but one clearly calling for the condemnation of both the schooner and her cargo; and the matters testified to by these witnesses upon their re-examinations are not only entirely consistent in themselves, but are corroborated by the other testimony in the case, and by the documents and papers found on board of the schooner. The cases which were cited by the counsel for the claimants upon the point of the admissibility of depositions taken on re-examination (The Haabet, 6 C. Rob. Adm. 54; The Ostsee, Spinks, Pr. Cas. 189; The Leucade, Id. 227; The Aline & Fanny, Id. 327) do not bear at all upon the question as to the admissibility of these re-examinations. They merely affirm the well-known principles of prize law, that affidavits of the captors are not to be admitted where, on the evidence of the persons on board of the captured vessel, there are no circumstances of suspicion in the case; that the case is, in the first instance, to be tried on evidence coming from the captured; that if, upon such evidence, no doubt arises, the property is to be restored; and that the privilege on the part of the captors of giving further proof is, in such cases, rarely granted. Within these principles, this court has endeavored, in all proper cases, to exhaust the knowledge of the persons found on board of captured vessels. Thus, in the case of The Peterhoff, pending in this court at the time with the present case, the deposition of Capt. Jarman, the master of the captured vessel, had been taken on the 1st of April, 1863, he having intervened as claimant, for the interest of the principals, the owners of the Peterhoff and her cargo, and having made the test oath to such claim on the 21st of April, 1863. Some of the other witnesses having deposed to the spoliation of papers in the case, the court, upon an affidavit made by Capt. Jarman, and upon the application of the claimants, and notwithstanding the objections of the counsel for the libellants and the captors, permitted Capt. Jarman to be re-examined upon one of the standing interrogatories, and to add to his answer thereto the explanatory statement contained in his affidavit. This explanation, and the matters deposed to by him on his further examination, were intended to relieve the owners of the Peterhoff and her cargo from the injurious effects of his concealment, on his first examination, of matters which ought to have been testified to by him in answer to the standing interrogatories, and of matters which were testified to by other witnesses. The court is entirely satisfied that it exercised its sound discretion in permitting the re-examination in the case of The Peterhoff [Case No. 11,024],

and the exercise of a like discretion calls for the admission in evidence of the depositions of Leisk and Chadwick, taken on re-examination in the present case. They are, accordingly, admitted in evidence.

Very important questions of public law have been discussed before the court in the present case, and in the kindred cases of The Springbok [Case No. 13,264] and The Peterhoff [Id. 11,024], all of which, with the case of The Gertrude [Id. 5,369], have been pending before the court at the same time. In the latter case, no claimant appeared for either the vessel or the cargo, she having been captured while on a voyage from Nassau, in endeavoring to run the blockade into a port of the enemy. Many of the principal questions involved in the present case, and in the cases of The Springbok and The Peterhoff, are alike; and, as the conclusion at which the court has arrived in all of those cases is to condemn the vessels and their cargoes, I shall announce, in this case, the leading principles of public law which lead to a condemnation in all the cases.

On behalf of the libellants, it is urged in this case: (1) That the Stephen Hart and her cargo were enemy property when the voyage in question was undertaken, and when the capture was made; (2) that the schooner was laden with articles contraband of war, destined for the aid and the use of the enemy, and on transportation by sea to the enemy's country at the time of capture; (3) that, with a full knowledge, on the part of the owner of the vessel and of the owners of her cargo, that the ports of the enemy were under blockade, the vessel and her cargo were dispatched from a neutral port with an intention, on the part of the owners of each, that, in violation of the blockade, both the vessel and her cargo should enter a port of the enemy. On the part of the claimants, it is maintained: (1) That the transportation of all articles, including arms and munitions of war, between neutral ports in a neutral vessel, is lawful in time of war; (2) that, if a neutral vessel, with a cargo belonging to neutrals, be in fact on a voyage from one neutral port to another, she cannot be seized and condemned as lawful prize, although she be laden with contraband of war, unless it be determined that she was actually destined to a port of the enemy upon the voyage on which she was seized, or unless she is taken in the act of violating a blockade. It is insisted, on the part of the claimants, that the Stephen Hart was, at the time of her capture, a neutral vessel, carrying a neutral cargo from London to Cardenas, both of them being neutral ports, in the regular course of trade and commerce. On the other side, it is contended that the cargo was composed exclusively of articles contraband of war, destined, when they left London, to be delivered to the enemy, either directly, by being carried into a port of the enemy in the Stephen Hart, or by being transshipped at Car-

denas to another vessel; that Cardenas was to be used merely as a port of call for the Stephen Hart, or as a port of transshipment for her cargo; that the vessel and her cargo are equally involved in the forbidden transaction; and that the papers of the vessel were simulated and fraudulent, in respect to her destination and that of her cargo. A condemnation is not asked if the cargo was in fact neutral property, to be delivered at Cardenas, for discharge and general consumption or sale there, but is only claimed if the cargo was really intended to be delivered to the enemy at some other place than Cardenas, after using that port as a port of call or of transshipment, so as to thus render the representations contained in the papers of the vessel false and fraudulent as to the real destination of the vessel and her cargo.

It would scarcely seem possible that there could be any serious debate as to the true principles of public law applicable to the solution of the questions thus presented; and, indeed, the law is so well settled as to make it only necessary to see whether the facts in this case bring the vessel and her cargo within the rules which have been laid down by the most eminent authorities in England and in this country. The principles upon which the government of the United States, and the public vessels acting under its commission, have proceeded, during the present war, in arresting vessels and cargoes as lawful prize upon the high seas, are very succinctly embodied in the instructions issued by the navy department on the 18th of August, 1862, to the naval commanders of the United States, and which instructions are therein declared to be a recapitulation of those theretofore from time to time given. The substance of those instructions, so far as they are applicable to the present case, is, that a vessel is not to be seized "without a search carefully made, so far as to render it reasonable to believe that she is engaged in carrying contraband of war for or to the insurgents, and to their ports directly, or indirectly by transshipment, or otherwise violating the blockade." The main feature of these instructions, so far as they bear upon the questions involved in this case, is but an application of the doctrine in regard to the captures laid down by the government of the United States at a very early day. In an ordinance of the congress of the Confederation, which went into effect on the 1st of February, 1782 (5 Wheat. [18 U. S.] append. p. 120), it was declared to be lawful to capture and to obtain condemnation of "all contraband goods, wares, and merchandise, to whatever nations belonging, although found in a neutral bottom, if destined for the use of the enemy."

The soundness of these principles, and the fact that the law of nations, as applicable to cases of prize, has been observed and applied by the government of the United States and its courts during the present war, was fully

recognized by Earl Russell, her Britannic majesty's principal secretary of state for foreign affairs, in his remarks made in the house of lords on the 18th of May last. Earl Russell there stated that the judgment of the United States prize courts, which have been reported to her majesty's government during the present war, did not evince any disregard of the established principles of international law; that the law officers of the crown, after an attentive consideration of the decisions which had been laid before them, were of opinion that there was no rational ground of complaint as to the judgments of the American prize courts; and that the law of nations in regard to the search and seizure of neutral vessels had been fully and completely acknowledged by the government of the United States. On the same occasion Earl Russell remarked: "It has been a most profitable business to send swift vessels to break or run the blockade of the Southern ports, and carry their cargoes into those ports. There is no municipal law, in this or any country, to punish such an act as an offence. I understand that every cargo which runs the blockade and enters Charleston is worth a million of dollars, and that the profit on these transactions is immense. It is well known that the trade has attracted a great deal of attention in this country, from those who have a keen eye to such gains, and that vessels have been sent to Nassau in order to break the blockade at Charleston, Wilmington, and other places, and carry contraband of war into some of the ports of the Southern States." He added: "I certainly am not prepared to declare, nor is there any ground for declaring, that the courts of the United States do not faithfully administer the law; that they will not allow evidence making against the captors, or that they are likely to give decisions founded, not upon the law, but upon their own passions and national partialities." He also said that, in a case of simulated destination,—that is, a vessel pretending that she is going to Nassau, when she is in reality bound to a port of the enemy.—the right of seizure exists.

The then solicitor of England (Sir Roundell Palmer) stated, in the house of commons, on the 29th of June last, referring to the cases of The Dolphin [Case No. 3.975] and The Pearl [Id. 10,874]. decided by the district court for the Southern district of Florida (those vessels having been captured while ostensibly on voyages from Liverpool to Nassau, and it having been held by the court that the intention of the owners of the vessels was that they should only touch at Nassau, and then go on and break the blockade at Charleston), that, "if the owners imagine that the mere fact of the vessel touching at Nassau when on such an expedition exonerated her, they were very much mistaken"; that the principles of the judgment in the case of The Dolphin "were to be found in every volume of Lord Stowell's decisions"; that it was well known to everybody that there was a large contraband

trade between England and America by way of Nassau; that it was absurd to pretend to shut their eyes to it; and that the trade with Nassau and Matamoras had become what it was in consequence of the war.

The foreign office of Great Britain, in a letter to the owners of the Peterhoff, on the 3d of April last, announced as its conclusion, after having communicated with the law officers of the crown, that the government of the United States had no right to seize a British vessel bona fide bound from a British port to another neutral port, unless such vessel attempts to touch at, or has an intermediate or contingent destination to, some blockaded port or place, or is a carrier of contraband of war destined for the enemy of the United States; that her majesty's government, however, cannot, without violating the rules of international law, claim for British vessels navigating between Great Britain and such neutral ports any general exemption from the belligerent right of visitation by the cruisers of the United States, or proceed upon any general assumption that such vessels may not so act as to render their capture lawful and justifiable; that nothing is more common than for those who contemplate a breach of blockade or the carriage of contraband, to disguise their purpose by a simulated destination and by deceptive papers; and that it has already happened, in many cases, that British vessels have been seized while engaged in voyages apparently lawful, and have been afterwards proved in the prize courts to have been really guilty of endeavoring to break the blockade, or of carrying contraband to the enemy of the United States.

The cases of The Stephen Hart, The Springbok [Case No. 13,264], The Peterhoff [Id. 11,-024], and The Gertrude [Id. 5,369], illustrate a course of trade which has sprung up during the present war, and of which this court will take judicial cognizance, as it appears from its own records and those of other courts of the United States, as well as from public reputation. Those neutral ports have suddenly been raised from ports of comparatively insignificant trade to marts of the first magnitude. Nassau and Cardenas are in the vicinity of the blockaded ports of the enemy, while Matamoras is in Mexico, upon the right bank of the Rio Grande, directly opposite the town of Brownsville, in Texas. The course of trade, in respect to Nassau and Cardenas, has been generally to clear neutral vessels, almost always under the British flag, from English ports for those places, and, using them merely as ports either of call or of transshipment, to either resume new voyages from them in the same vessels, or to transship their cargoes to fleet steamers, with which to run the blockade, the cargoes being composed, in almost all cases, more or less, of articles contraband of war. The character and course of this trade, and its sudden rise, are very properly commented upon in a dispatch from the secretary of state of the Unit-

ed States to Lord Lyons, of the 12th of May, 1863.

The broad issue in the merits of this case is whether the adventure of the Stephen Hart was the honest voyage of a neutral vessel from one neutral port to another neutral port, carrying neutral goods between those two ports only, or was a simulated voyage, the cargo being contraband of war, and being really destined for the use of the enemy, and to be introduced into the enemy's country by a breach of blockade by the Stephen Hart, or by transshipment from her to another vessel at Cardenas. It is conceded in the argument of the leading counsel for the claimants that, if the property was owned by the enemy, and was fraudulently on its way to the enemy as neutral property, it was enemy's property, and was liable to capture, no matter whence it came or whither it was bound; and that, if the vessel were really intending and endeavoring to run the blockade, the property was liable to capture, no matter to whom it belonged or what was its character; but that if it was neutral property, in lawful commerce, it was safe from seizure.

The question whether or not the property laden on board of the Stephen Hart was being transported in the business of lawful commerce is not to be decided by merely deciding the question as to whether the vessel was documented for, and sailing upon, a voyage from London to Cardenas. The commerce is in the destination and intended use of the property laden on board of the vessel, and not in the incidental, ancillary, and temporary voyage of the vessel, which may be but one of many carriers through which the property is to reach its true and original destination. If this were not the rule of the prize law, a very wide door would be opened for fraud and evasion. A cargo of contraband goods, really intended for the enemy, might be carried to Cardenas in a neutral vessel, sailing from England with papers which, upon their face, import merely a voyage of the vessel to Cardenas, while, in fact, her cargo, when it left England, was destined by its owners to be delivered to the enemy by being transshipped at Cardenas into a swifter vessel. And such, indeed, has been the course of proceeding in many cases during the present war. Nor is the unlawfulness of the transportation of contraband goods determined by deciding the question as to whether their immediate destination was to a port of the enemy. Thus, it is held that, in order to constitute the unlawfulness of the transportation of contraband goods, it is not necessary that the immediate destination of the vessel and cargo should be to an enemy's country and port; for, if the goods are contraband, and destined to the direct use of the enemy's army or navy, the transportation is illegal. If an enemy's fleet be lying, in time of war, in a neutral port, and a neutral vessel should carry contraband goods to that port, not intended for sale in the neutral market, but destined to the exclusive supply of the hostile forces, such conduct would be a direct interposition in the war, by furnishing essentials in its prosecution, and would be a departure from the duties of neutrality. Halleck, Int. Law, p. 576, c. 24, § 11. The proper test to be applied is whether the contraband goods are intended for sale or consumption in the neutral market, or whether the direct and intended object of their transportation is to supply the enemy with them. To justify the capture, it is enough that the immediate object of the voyage is to supply the enemy, and that the contraband property is certainly destined to his immediate use. While it is true that goods destined for the use of the neutral country can never be deemed contraband, whatever be their character and however well adapted they may be to the purposes of war, yet, if they are destined for the direct use of the enemy's army or navy they are not exempt from forfeiture on the mere ground that they are neutral property, and that the port of delivery is also neutral. 1 Duer, Ins. 630; The Commercen, 1 Wheat. [14 U. S.] 388, 389.

If the contraband cargo of the Stephen Hart had been destined for the use of the fleet of the enemy lying in the harbor of Cardenas, there could be no doubt that it might lawfully have been captured as prize of war on its way to Cardenas. And, if the contraband cargo was really destined, when it left its port of departure in England, for the use of the enemy in the country of the enemy, and not for sale or consumption in the neutral port, no principle of the law of nations, and no consideration of the rights and interests of lawful neutral commerce, can require that the mere touching at the neutral port, either for the purpose of making it a new point of departure for the vessel to a port of the enemy, or for the purpose of transshipping the contraband cargo into another vessel, which may carry it to the destination which was intended for it when it left its port of departure, should exempt the vessel or the contraband cargo from capture as prize of war. If it was the intention of the owner of the Stephen Hart, or of the owners of her cargo, having control of the movements of the vessel, that she should simply touch at Cardenas, and should proceed thence to Charleston, or some other port of the enemy, her voyage was not a voyage prosecuted by a neutral vessel from one neutral port to another neutral port, but a voyage which was, at the time of her seizure, in course of prosecution to a port of the enemy, although she had not as yet reached Cardenas, and although her regular papers documented her for a voyage from London to Cuba. Such a voyage was one begun and carried on in violation of the belligerent rights of the United States to blockade the ports of the enemy, and to prevent the introduction into those

ports of arms and munitions of war. The division of a continuous transportation of contraband goods into several intermediate transportations, by means of intermediate voyages by different vessels carrying such goods, cannot make a transportation, which is, in fact, a unit, to become several transportations, although, to effect the entire transportation of the goods requires several voyages by different vessels, each of which may, in a certain sense and for certain purposes, be said to have its own voyage, and although each of such voyages, except the last one in the circuit, may be between neutral ports. Nor can such a transaction make any of the parts of the entire transportation of the contraband cargo a lawful transportation, when the transportation would not have been lawful if it had not been thus divided. The law seeks out the truth, and never, in any of its branches. tolerates any such fiction as that under which it is sought to shield the vessel and her cargo in the present case. If the guilty intention, that the contraband goods should reach a port of the enemy, existed when such goods left their English port, that guilty intention cannot be obliterated by the innocent intention of stopping at a neutral port on the way. If there be, in stopping at such port, no intention of transshipping the cargo, and if it is to proceed to the enemy's country in the same vessel in which it came from England, of course there can be no purpose of lawful neutral commerce at the neutral port by the sale or use of the cargo in the market there; and the sole purpose of stopping at the neutral port must merely be to have upon the papers of the vessel an ostensible neutral terminus for the voyage. If, on the other hand, the object of stopping at the neutral port be to transship the cargo to another vessel, to be transported to a port of the enemy, while the vessel in which it was brought from England does not proceed to the port of the enemy, there is equally an absence of all lawful neutral commerce at the neutral port; and the only commerce carried on in the case is that of the transportation of the contraband cargo from the English port to the port of the enemy, as was intended when it left the English port. This court holds that, in all such cases, the transportation or voyage of the contraband goods is to be considered as a unit, from the port of lading to the port of delivery in the enemy's country; that if any part of such voyage or transportation be unlawful, it is unlawful throughout; and that the vessel and her cargo are subject to capture, as well before arriving at the first neutral port at which she touches after her departure from England, as on the voyage or transportation by sea from such neutral port to the port of the enemy.

These principles were laid down and applied by the district court for the Southern district of Florida in the cases of The Dolphin and The Pearl, and the views of that court are fully adopted by this court, and are to be regarded as a part of the settled law governing prize tribunals. It is laid down, in Halleck on International Law (page 504, c. 21, § 11), that the ulterior destination of the goods determines the character of the trade, no matter how circuitous the route by which they are to reach that destination; that even where the ship in which the goods are embarked is destined to a neutral port, and the goods are there to be unladen, yet if they are to be transported thence, whatever may be the mode of conveyance, to an enemy's port or territory, they fall within the interdiction and penalty of the law; that the trade from an enemy's country through a neutral port is likewise unlawful, and that the goods so shipped through a neutral territory, even though they may be unladen and transshipped, are liable to condemnation; that it is an attempt to carry on trade with the enemy by the circuitous route of a neutral port, and thus evade the penalty of the law; that the law will not countenance any such attempt to violate its principles by a resort to the shelter of neutral territory; that any such voyage is illegal at its inception; and that the goods shipped are liable to seizure at the instant it commences. The same docrines are asserted in 1 Kent, Comm. (8th Ed.) p. 85, note a, in 1 Duer. Ins. p. 568, § 13, and in Jecker v. Montgomery, 18 How. [59 U. S.] 110, 115.

The same principles are maintained by the English authorities. In 2 Wildm. Int. Law, p. 20, it is asserted that no exemption from the consequences of sending goods to the enemy will be gained by sending them through a neutral country; that the interposition of a prior port makes no difference; that all trade with the enemy is illegal; that the circumstance that the goods are to go first to a neutral port will not make the trade lawful; and that it is not competent, during a war, for a British subject to send goods to a neutral port, with a view of sending them forward, on his own account, to an enemy's port, consigned by him to persons there, as in the ordinary course of commerce. These principles were laid down by Sir William Scott, in The Jonge Pieter, 4 C. Rob. Adm. 79. The particular doctrine thus asserted had reference to the trading of British subjects with the enemy of Great Britain. But the reason of the doctrine makes it equally applicable to the case of a neutral attempting to send contraband goods to an enemy of the United States through the interposition of a prior neutral port. In the case of The Richmond, 5 C. Rob. Adm. 325, an American vessel was seized in the port of St. Helena, and proceeded against as a prize, on the ground that she was going, under a false destination, to the Isle of France, an enemy's port, with contraband articles concealed on board, and with a view of selling the vessel there, as a vessel well adapted for a ship

of war, and for the service of privateering. Sir William Scott, in his judgment in the case, says: "It is difficult not to consider the Isle of France as the possible port of destination of this vessel, according to the original intention,—I say, as the possible port, at least, if not the principal and absolute port of destination of the original voyage. It cannot be denied, undoubtedly, that an American ship might go to St. Helena, and from thence to the Isle of France, or any other port of the enemy, provided the cargo was of an innocent nature. If, on the contrary, the cargo was of a noxious character, the circumstance of merely touching at an English port would not alter the nature of a voyage in itself illegal." He then comes to the conclusion that the vessel had on board articles contraband of war, —pitch and tar,—and• holds that there are strong grounds to presume that the original destination of those articles was absolutely to the Isle of France. "But," he adds, "supposing that it was only of a shifting nature, and that it was merely eventual, that, in law, would be quite sufficient, and that, at least, must be taken to have been the design of the parties. If the intention was no more than this: 'I will go and sell pitch and tar at St. Helena, if I can; and, if I cannot, I will go with them to the Isle of France, and sell them there,'—that is an unlawful purpose, and every step taken in the prosecution of such a design is an unlawful act. The interposition of an English port would not make it innocent. The pitch and tar were going with an original destination, either positive or eventual, to the Isle of France." In the case of The Maria, 5 C. Rob. Adm. 365, Sir William Scott says: "It is an inherent and settled principle, that the mere touching at any port, without importing the cargo into the common stock of the country, will not alter the nature of the voyage, which continues the same in all respects, and must be considered as a voyage to the country to which the vessel is actually going for the purpose of delivering her cargo at the ultimate port." The doctrine here laid down is equally applicable to the cargo where it is carried to the ultimate port in a different vessel from the one in which it is carried to the intermediate port. In the case of The William, Id. 385, on appeal before the lords commissioners of appeal in prize cases, Sir William Grant, in delivering the judgment of the court, says: "Neither will it be contended that the point from which the commencement of a voyage is to be reckoned changes as often as the ship stops in the course of it; nor will it the more change because a party may choose arbitrarily, by the ship's papers or otherwise, to give the name of a distinct voyage to each stage of a ship's progress. The act of shifting the cargo from the ship to the shore, and from the shore back again into the ship, does not necessarily amount to the termination of one voyage and the commencement of another. It may be wholly unconnected with any pur-

pose of importation into the place where it is done. Supposing the landing to be merely for the purpose of airing or drying the goods, or of repairing the ship, would any man think of describing the voyage as beginning at the place where it happened to become necessary to go through such a process? Again, let it be supposed that the party has a motive for desiring to make the voyage appear to begin at some other place than that of the original lading, and that he therefore lands the cargo purely and solely for the purpose of enabling himself to affirm that it was at such other place that the goods were taken on board. Would this contrivance at all alter the truth of the facts? Would not the real voyage still be from the place of the original shipment, notwithstanding the attempt to give it the appearance of having begun from a different place? The truth may not always be discernible; but, when it is discovered, it is according to the truth, and not according to the fiction, that we are to give to the transaction its character and denomination. If the voyage from the place of lading be not really ended, it matters not by what acts the party may have evinced his desire of making it appear to have been ended. That those acts have been attended with trouble and expense cannot alter their quality or their effect. The trouble and expense may weigh as circumstances of evidence to show the purpose for which the acts were done; but, if the evasive purpose be admitted or proved, we can never be bound to accept, as a substitute for the observance of the law, the means, however operose, which have been employed to cover a breach of it. Between the actual importation by which a voyage is really ended, and the colorable importation which is to give it the appearance of being ended, there must necessarily be a great resemblance." The cases of The Nancy, 3 C. Rob. Adm. 122, and The United States, Stew. Vice Adm. 116, were cases in which a voyage, consisting of different parts, was held to be not two voyages, but one entire transaction, formed upon one original plan, conducted by the same persons, and under one set of instructions; and it was held that, in cases of contraband, especially when there is anything of fraud or concealment, a return voyage is to be deemed connected with an outward voyage.

It is equally well settled that the inception of the voyage completes the offence; that, from the moment that the vessel, with the contraband articles on board, quits her port on the hostile destination, she may be legally captured; that it is not necessary to wait until the ship and goods are actually endeavoring to enter the enemy's port; and that, the voyage being illegal at its commencement, the penalty immediately attaches, and continues to the end of the voyage, at least so long as the illegality exists. Halleck, Int. Law, p. 573, c. 24, § 7; 2 Wildm. Int. Law, p. 218; 1 Duer, Ins. 626, § 7. The same doctrine is laid down by Sir William Scott in

The Imina, 3 C. Rob. Adm. 167, and in The Trende Sostre, 6 C. Rob. Adm. 390, note. In The Columbia, 1 C. Rob. Adm. 154, Sir William Scott says that the sailing, with an intention of evading a blockade, is beginning to execute that intention, and is an overt act constituting the offence, and that from that moment the blockade is fraudulently invaded. The same view is maintained by him in The Neptunus, 2 C. Rob. Adm. 110.

Such being the well-settled principles of public law, in reference to the carriage of contraband goods to the enemy, it only remains to be seen whether the Stephen Hart and her cargo are liable to condemnation according to those principles. If she was, in fact, a neutral vessel, and if her cargo, although contraband of war, was being carried from an English port to Cardenas, for the general purpose of trade and commerce at Cardenas, and for use or sale at Cardenas, without any actual destination of the cargo, prior to the time of the capture, to the use and aid of the enemy, then most certainly both the vessel and her cargo were free from liability to capture. The Stephen Hart was laden with a cargo composed exclusively of arms, munitions of war, and military equipments. It is urged, on the part of the claimants, that the vessel was a neutral carrier of the products of her own country, and of the property of neutral merchants, from one neutral port to another. A strong appeal has been made to the court not to permit the United States, as a belligerent, to stop the manufactures and commerce of all other nations, or to dictate the mode in which their trade shall be carried on. It is said that a peaceful neutral may quicken his industry and his commerce, and multiply his gains, by the high prices caused by the demands of those belligerents who have exchanged the character of producers for that of consumers and destroyers; that British merchants may lawfully seek to supply the quickened demand at the new price, or become the carrier for those whose ships are exposed to capture; that if, for any reason, they may not sell to the enemy of the United States directly, then they may sell to others who may sell to him; that if they are unwilling to run the blockade, they may sell to those who are willing to take the risk; that if they may not sell to Charleston, they may sell to Cardenas, without troubling themselves with the question whether Cardenas will sell freely to those who may come from Charleston to buy: and that the national wealth of the United States has been largely increased, during the warfare of other nations, by the employment of its citizens as neutral carriers in just such lawful commerce. But a neutral merchant ought not to forget that the duties which the law of nations imposes on him flow from the same principle which ought to control the action of his government as a neutral government; that, where he supplies to the enemy of a belligerent munitions or other articles contraband of

war, or relieves, with provisions or otherwise, a blockaded port, he makes himself personally a party to a war, in which, as a neutral, he has no right to engage; that, under such circumstances, his property is justly treated as the property of an enemy; and that the observance of those rules which the law of nations prescribes for his conduct is a high moral duty. 1 Duer, Ins. 754, 755, § 24.

It is contended, on the part of the libellants, that the voyage of the Stephen Hart was originated and prosecuted with the illicit purpose of conveying to the enemy articles contraband of war, and of violating the blockade of a port of the enemy. It will conduce to a better understanding of the case to trace the previous history of the vessel, so far as we learn it from the evidence. She was built in the United States, and had been previously called the "Tamaulipas." At the time the war broke out she was owned in New Orleans, which place she left in June, 1861, while that port was under blockade, although she was allowed to proceed on her voyage after her papers had been examined by a blockading vessel. Before she left New Orleans, and while that port was a port of the enemy, and was under blockade, she was sold there, about May, 1861, to an English owner residing there. Chadwick testifies to this. He also says that he understood that this English owner, a person named Allen, gave a power of attorney to Capt. Ackley, the then master of the vessel, who was in the employ of Allen and who took the vessel to Cuba, and thence to England, authorizing him to sell her, and that she was sold in England to the claimant, Harris. All this appears upon the first examination of Chadwick. But no bill of sale of the vessel is produced either to Allen or to Harris, and there is no mention anywhere of the existence of any, not even in the test oath of Harris. Nor is there any proof of the payment of any consideration on either sale, other than hearsay evidence and the test oath of Harris. All the knowledge that Chadwick has on the subject of the sale to Harris is that Capt. Ackley, the former master of the vessel, told him that he had sold the vessel to Harris for £2,000, and had got his money, or the drafts for it. Capt. Dyett says that the only way he knows that Harris is the owner is by seeing his name in the register as owner. Neither Capt. Dyett nor Chadwick knows anything about any bill of sale of the vessel. Although, in the certificate of registry, which is dated at Liverpool, October 15, 1861, Harris is named as the owner, yet it is expressly stated in the certificate that that paper is not a document of title. Capt. Dyett says that he was appointed to the command of the vessel on the 15th of November, 1861, he thinks, which was four days before she was cleared at the customhouse in London; that he was appointed to such command by Messrs. Isaac, Campbell & Co., of London; and that Mr. Saul Isaac, of that firm, deliv-

ered the vessel to him. No charter party, chartering the vessel to the owners of the cargo, was found on board. Capt. Dyett says that there was no charter-party for the voyage, and Chadwick says that he does not know of any charter party. The only evidence of any payment by Harris for the vessel is his test oath to his claim. But in that test oath he does not state to whom he paid the purchase money, nor does he state that any bill of sale of the vessel was delivered to him, nor is the power of attorney from Allen, under which the sale is alleged to have been made by Capt. Ackley, produced, or its absence accounted for.

In the case of The Christine, Spink's Prize Cas. 82, during the recent war between England and Russia, where a vessel was claimed by one Schwartz, her master, as a citizen of Lubeck, and a neutral owner, he alleged that he had purchased her, just before the commencement of the war, from her Russian owners. Dr. Lushington says, in delivering the judgment of the court, after noting the fact that the master had been master of the vessel, under Russian colors, for eight months before the time of the alleged purchase, "This contract is a very suspicious one, not only on the ground that it was immediately antecedent to the war, but also on the ground that it was a purchase by the master. A party coming forward under such circumstances, and claiming the ship in a neutral character, is bound not only to produce, but to have on board, sufficient documents to satisfy the court that he possesses a bona fide title. I do not say that the court would bind him down to the production, in the first instance, of all the papers which it might ultimately deem necessary, to induce it to pronounce for a restitution, but I do say that it ought to be a contract of that nature. in itself, supported by such documents found on board as would give the court good reason to suppose that, if the opportunity of producing further proof were allowed. it would give him a title to restitution; otherwise, further proof is a mockery. There must be proof of payment in all cases where any suspicion arises as to the validity of the contract at the time of sale. It is quite vain to say, 'Mine is a bona fide. valid contract.' The money must have been paid before the master assumes the command, or ventures out on the high seas during war; otherwise, the ship would be liable to be condemned. The title on which the master claims—the bill of sale—is not here. Now, this may be a bona fide claim. I do not decide whether it is or not; but I decide that it is not legal, according to the usage and practice of the court, and the laws which regulate the court in matters of prize. If this important paper, which is the sole title deed, is not produced, what satisfaction can the court have? The title deed to the ship should be on board of the ship. If further proof were allowed in this particular case,

could the court feel satisfied that it would receive a genuine document? The case is teeming with suspicion throughout. Is there any one document whatever produced that can satisfy the court that the transaction was bona fide, independently of all the circumstances I have mentioned? Certainly there is one document." That document was a certificate, showing that the ship's clearer appeared at Lubeck, and swore that he was lawfully authorized by the claimant, by power of attorney, and that the vessel commanded by the claimant solely and bona fide belonged to him. Dr. Lushington proceeds: "So that this gentleman makes oath, by virtue of a power of attorney from Captain Schwartz, which power of attorney is not produced. I have simply this document, which in no degree corroborates the claim." He then adds that, in a case where the question in dispute is the bona fides of the sale, it has always been held that proof of actual payment was essential, and decides that he cannot allow further proof in the case, and that the vessel must be condemned. In the case of The Sisters, 5 C. Rob. Adm. 155, Sir William Scott says: "A bill of sale is the proper title to which the maritime courts of all the countries would look. It is the universal instrument of transfer of ships, in the usage of all maritime countries, and in no degree a peculiar title deed or conveyance, known only to the law of England. It is what the maritime law expects, and what the court of admiralty would, in its ordinary practice, always require."

As the Stephen Hart was built in the United States, she must, on the evidence, be held to have belonged, at the commencement of the war, to a citizen of New Orleans, and her transfer, after the blockade was established, to a British subject, a resident of New Orleans, not being in any manner proved by competent evidence, she was still, in judgment of law. enemy's property, and liable to capture as such. But, in addition to this, even if it were shown that she had, in fact, been legally transferred to Allen, a British subject, residing in New Orleans, yet, as the domicile of Allen was in the country of the enemy at the time of the transfer, his status follows the character of that country in war. and the law of nations pronounces him an enemy. The Pizarro, 2 Wheat. [15 U. S.] 227; The Prize Cases, 2 Black [67 U. S.] 635, 674. Moreover, the transfer by Allen to Harris, even if that were sufficiently proved, having been made under a power of attorney. must, in judgment of law, be regarded as having been made at New Orleans by Allen, a resident of New Orleans, and as of the time when the power of attorney was given. and thus as having been made in a blockaded port of the enemy, in time of war, by a British resident there, and as leaving the vessel equally liable to capture as enemy property. The General Hamilton, 6 C. Rob. Adm. 61; The

Two Brothers, 1 C. Rob. Adm. 131. There is, therefore, abundant ground for condemning the vessel, irrespective of any of the reasons connected with the traffic in which she was engaged at the time of her capture; and the like conclusions follow in respect to the cargo.

The cargo of the vessel, composed of arms, munitions of war, and military equipments, is claimed as the sole property of S. Isaac, Campbell & Co., of London, who appear to be dealers in military goods. It is alleged by the claimants of the vessel and cargo that the real destination of the vessel and cargo was Cardenas, in the island of Cuba. But it is to be noted that the shipping articles specify the voyage as a voyage from London to Cuba (Cuba generally, not Cardenas or any other port in Cuba) and Sierra Leone, "and any port $^{and}_{or}$ ports on coast of Africa, $^{and}_{or}$ North $^{and}_{or}$ South America $^{and}_{or}$ West Indies, and back to a final port of discharge in the United Kingdom." All the other official papers found on board of the vessel, such as the receipt for the Dover harbor duties, the certificate of the shipping master for the clearance, the receipt for light duties at London, the receipt for harbor duties at Ramsgate, the certificate from the searcher's office of the London customhouse, and the victualing bill, speak of the voyage as one from London to Cuba. The telegram of the 23d of November, 1861, from S. Isaac, Campbell & Co., to Lloyd's agent at Deal, speaks of the schooner as bound for Cardenas. The title-page of the ordinary log book speaks of the voyage as one from London to Cardenas, Cuba. The label on the outside of that log book has the blank for the place at which the voyage commenced filled up with the words, "London, England," but the blank for the place of destination is not filled up at all. The blanks at the tops of the pages are filled up on only one page, although 62 pages are occupied with entries of the progress of the voyage, from the 19th of November, 1861, to and including noon of the 27th of January, 1862. The page referred to has, at the top, the voyage entered as "from London towards Cuba." On the first page, under date of November 19, 1861, there is an entry that the pilot "took charge of the schooner Stephen Hart on a voyage to Cuba." The title-page of the official log book speaks of the voyage as being one to "Cuba and Sierra Leone." None of the letters found on board are addressed to any person at Cardenas. But there was found on board a letter from Saul Isaac to Mr. Crawford, the British consul general at Havana, asking his "assistance and advice for Capt. Dyett, of the schooner Stephen Hart, should he need it during his stay at Havana."

The letter of instructions to Capt. Dyett from S. Isaac, Campbell & Co., produced by Capt. Dyett on his examination, directs him to proceed "to Cardenas, Cuba," and to report, on his arrival there, "to Charles J. Helm, Esq're, to whom you will consign yourself and vessel, and from whom you will receive all orders for your future actions with reference to the schooner and cargo, and you will be pleased to implicitly obey all orders given by Charles J. Helm, Esq're. * * * Mr. Helm may require the schooner for use at Havannah. Should he do so, you will at once make the best arrangements for the immediate return to England of yourself and crew. Should, however, any one wish to remain in the employ of Mr. Helm, we have no objection to his doing so. In case Mr. Helm has no use for the vessel after discharging the cargo, you will receive full instructions from Messrs. Isaac, Campbell & Co., by mail leaving on the 2d proximo, for proceeding to the west coast of Africa." The letter then directs Capt. Dyett to deliver, without delay, on his arrival, the letters which he has for Mr. Helm and Mr. Crawford, and also, immediately on his arrival at Cardenas, to telegraph "to Cahuzac Bros., Havana, who will, on receipt of message, communicate with you." The letter to Mr. Helm, thus referred to, was also produced by Capt. Dyett on his examination, and is from Saul Isaac, and is addressed "Charles J. Helm, Esq're, care of J. Crawford, Esq're, Havana." It says: "The bearer of this is Capt. Dyett, of the schooner Stephen Hart, for whom I ask the favor of your good offices. Should he require assistance or advice during his stay at Havana, he will hand you his instructions from my house to read, and I feel assured that you will in all matters find him a good man."

It is very manifest, from these documents, that Mr. Helm, Mr. Crawford, and Cahuzac Bros., the only parties named as having any concern in Cuba with the vessel or her cargo, were all of them to be found at Havana, and none of them at Cardenas, and that no person in Cardenas was consignee either of the vessel or the cargo; that it was contemplated that the vessel should go to Havana, if Mr. Helm required it, and be given up for use to Mr. Helm, at Havana, if he required it; that Capt. Dyett was to obey the orders of Helm in all his actions with reference to the vessel and her cargo; that Capt. Dyett and his crew were authorized to remain in the employ of Mr. Helm, if any of them desired to do so; and that Mr. Helm was to have the control of the discharging of the cargo of the vessel, and the right to use the vessel after the cargo was discharged. It is also to be noted, that these instructions to Capt. Dyett were not from Harris, the alleged owner of the vessel, but were from S. Isaac, Campbell & Co., who claim to be the owners of the whole of her cargo. No instructions whatever from Harris to Capt. Dyett were found on board, nor is it pretended that he had any from Harris. Harris appears to have given up the entire con-

trol of the vessel and of her movements to S. Isaac, Campbell & Co.; and, for these reasons, independently of all other considerations, the owner of the vessel must be held to have involved her in any illegality of which S. Isaac, Campbell & Co. or Capt. Dyett have been guilty in respect to the cargo of the vessel, especially in view of the facts, which Capt. Dyett states, that he was put in command of the vessel by that firm, and that there was no charter party for the voyage. Jecker v. Montgomery, 18 How. [59 U. S.] 110, 119.

The conclusion is irresistible, from the contents of the three letters referred to, that there was no intention whatever of discharging the cargo of the vessel at Cardenas; and that, if discharged at all in Cuba, it was to be discharged at Havana. As no manifest, bills of lading, or invoices, or any other papers, except the letter of instructions to Capt. Dyett, giving any information as to the character of the cargo, or its owners, or its consignees, were found on board of the vessel, the conviction is forced on the mind that the cargo had a single ownership and a single destination; that that ownership was one represented by Mr. Helm as its agent; and that that destination was to the place where his principals resided, and where they would derive the most benefit from the cargo. Who was Charles J. Helm? Capt. Dyett speaks of him as "Maj. Helm," and says that he resides in Havana. Chadwick, on his second examination, says that Helm was the agent for the "Confederate States" in Cuba. This being so, it may very well be inferred that this cargo of arms and munitions of war was destined to be carried into the enemy's country, as we find the vessel and her cargo placed, by the orders of S. Isaac, Campbell & Co., within the entire control and subject to the orders of Helm. But, independently of this, the evidence is irresistible, that the cargo was destined for the enemy's country. The test oaths, both of Harris and of Samuel Isaac, when examined carefully, fall far short of a frank and clear statement of an innocent destination for the vessel and cargo. The test oath of Harris says that the true and only destination of the vessel, with the cargo, was Cardenas, "where the same was to be delivered." This oath would be satisfied by a delivery of the cargo in bulk at Cardenas to Helm, and its transshipment there to another vessel, to be carried to a port of the enemy, in pursuance of such an original destination. It does not state that the destination of the cargo was not to a port of the enemy. And it states, in very suspicious language, that it was not intended that the vessel should enter, or attempt to enter, any port of the United States, but it does not state that it was not intended that the vessel or her cargo should enter, or attempt to enter, any port of the enemy of the United States, or any port blockaded by the naval forces of the United States. In all these particulars the test oath of Samuel Isaac to the claim for the cargo holds the same suspicious language, and is wanting in the same averments. The court searches in vain through these test oaths to find those full and honest allegations which should characterize the test oath to a claim made by a neutral really engaged in lawful and innocent commerce.

I shall now review the evidence in the case, in order to see to what conclusion it leads. Capt. Dyett says that he does not remember seeing any "Southern flag" on board of his vessel, although he says that, if the "Southern flag" were put before him, he should not know it. He admits, however, that, besides the English colors, under which the vessel sailed, and the American flag,—"that is, the stars and stripes,"—there were other flags in the vessel's bag. Chadwick says that they had the "Confederate" flag on board, and cut up the American flag to make a burgee of it. A "burgee" is defined by lexicographers to be "a distinguishing flag or pennant." Leisk says that the vessel had an American flag on board, and another flag that looked similar to the American flag. Nellman says that she had the American ensign, which was cut up on the voyage to make a burgee of, and also "a flag of the Confederate States of America"; that he saw that flag a few days before the capture, in the sail cabin, in a bag with the burgee; and that, on the day of the capture, he found the burgee on the floor in the main cabin, and made thorough search for "the Confederate flag," but could not find it. Allen says that they had the American colors on board, and another flag with stars and stripes, "but not as many stars as the old American flag"; and that he does not know whether that was the "Confederate flag" or not, as he never saw one, to know it, unless that was one. Chadwick, on his re-examination, says that, after the capture of the vessel, and while the captors were in charge, he took this "Confederate flag" from where it was hid in his clothes bag, and threw it overboard; and that this flag was intended to be displayed in connection with a peculiar one, called the "Isle of Man's flag," or signal, "which was adopted by the Southern States as a signal for a friendly vessel wishing to enter, and which should be protected, as far as possible, by them." This signal flag was probably the burgee of which the witnesses speak. Capt. Dyett says that the schooner was captured about 82 miles from Point de Yeacos, in Cuba. Chadwick says that the capture took place between Cuba and Key West, near the coast of Florida. Nellman and Allen say that the capture took place about 30 miles from Key West. Capt. Dyett says that the capture took place about 25 miles from Key West, and about 82 miles from Cardenas. Capt. Dyett says that the vessel was bound for Cardenas; that the contents of her cargo

were unknown to him, except that he saw some cases marked "Long Enfield," which he supposed contained "long Enfield guns," and he thinks he saw a few bales marked "Socks"; and that at Erith, below London, on the Thames, some packages were taken in stamped "Ball Cartridges." But, he says, "she had no goods on board which were contraband of war, or otherwise prohibited by law." He also says that he cannot state anything further in regard to the real and true property and destination of the vessel and cargo, except that, after he had discharged his cargo he was to proceed to Sierra Leone, as stated in his letter of instructions. Chadwick, on his first examination, says that they were bound to Cardenas; that the cargo consisted of powder and munitions of war; that he understood, from the captain and the shipping articles, that they were bound to Cardenas, and from there to Sierra Leone; and that he knows nothing beyond that. Leisk says that the vessel was bound to Cardenas and Sierra Leone; that he knew that her cargo, consisting of arms, powder, and soldiers' equipments, was contraband of war; and that he knows nothing about the destination of the vessel and cargo, except that they were bound to Cardenas. Nellman says that the vessel was bound to Cuba, Sierra Leone, or the West Indies, or some port in North or South America; and that he does not know to which of those several ports or places they were bound first. In this particular he confirms the very ambiguous and alternative language in the shipping articles. He also says that the cargo consisted of Enfield rifles, powder, cartridges, shot, shell, soldiers' accouterments, such as knapsacks, belts, and pouches, and some heavy boxes, which he thinks contained small cannon; and that the lading consisted entirely of warlike stores and articles. He thus manifests a knowledge of the cargo which is in striking contrast with Capt. Dyett's ignorance. Nellman says that he thinks that these goods are contraband of war. Capt. Dyett, however, says that Enfield rifles and ball cartridges are not contraband of war. Allen says that the vessel was bound to Cuba, and that the captain said he was going to Cardenas and from there to the coast of Africa. As to the cargo, Allen says that he had seen boxes marked "Long Enfields," which he took to be guns, and had heard there was powder, and had seen bales of blankets and other military equipments, and believes that she had a general cargo of arms and munitions of war.

Capt. Dyett says that he does not know who owns the cargo, but his impression is that it belongs to Isaac, Campbell & Co.; that he does not know who were the laders of the cargo, or for whose risk and account the goods were, or what interest Maj. Helm had in them; and that he does not know to whom they would belong if restored and delivered at their destined port. Chadwick says that he heard, in London, that Isaac, Campbell & Co. owned the cargo. Nellman says that he believes the cargo is owned "in the Confederate States of America"; that he heard Chadwick say so; that he never heard anything further concerning the cargo and its owners, except that Mr. Chadwick told him that the cargo was going to some place in "the Confederate States," and professed to know all about it. He also says that Mr. Hughes, who, he believes, is an agent for "the Confederate States," put the cargo on board, and was the lader thereof, and seemed to be the principal man, and had the most to say about the vessel and cargo; that the goods were to be delivered in the Southern States, at some port therein, and he thinks for the account or benefit of some person in those states; and that he believes, from what he heard on board the vessel, that the cargo was destined for some port in the Southern States, either to be carried there in that vessel, or to be transshipped and put in another vessel for the same purpose. He also says that he thinks that the vessel was in reality bound for Cuba, and that, after arriving there, he would receive instructions as to what particular port or place she would go to in the Southern States, or as to whether the cargo should be transshipped and put on board another vessel; and that Chadwick told him that a steamer would receive the cargo at Cuba very probably, and would carry it thence to some Southern port. Capt. Dyett says that he signed four bills of lading for the cargo, which were prepared by the broker and laid before him to sign; that he signed them without reading them, and does not know their contents; and that he had no bill of lading on board when he sailed, or at any time before his capture. He also says that he signed a manifest before the collector of London, and left it at the office of the brokers, Speyer & Haywood, in London, and has not seen it since; that the manifest was in the usual form, and made from the bills of lading; and that the bills of lading and manifest were to be forwarded to him at Cardenas. He also says that there were no invoices on board of the vessel.

Capt. Dyett, on the capture of the vessel, did not give up to the prize master the letter of instructions from S. Isaac, Campbell & Co. to him, or the letter from Saul Isaac to Charles J. Helm, of November 19, 1861. He only produced them on his examination in preparatorio, after his arrival at New York, in answer to the searching inquiries of the standing interrogatories. He says that he did not give up those letters to the prize master, because he did not know that he was bound to give them up. Yet he says that he gave to the prize master his ship's log book, his official log book, and his desk, with all the papers therein, being his private papers, and in no way relating to the vessel; and among the papers which he so gave up is found the compara-

tively unimportant letter from Saul Isaac to the British consul at Havana, and the telegrams and official papers of the vessel, which were calculated, on their face, to show a fair and honest voyage from London to Cuba. The two letters which he did withhold, namely, the instructions to himself and the letter to Helm, were the only documents on board which in any way connect Mr. Helm with the vessel and her cargo. This withholding or temporary suppression of these two letters, whose character and contents I have already commented upon, is one of those circumstances which are always regarded with suspicion, particularly where the suppression is made by a master. I shall have occasion to refer to this point hereafter, in connection with the attempted suppression of important papers by Chadwick. That the suppression of these letters by Capt. Dyett was premeditated, is shown by the testimony of Nellman, who says that Capt. Dyett had a letter with him directed to some one, and that he heard him and Chadwick talk about it an hour or so before the capture, just when the capturing vessel was firing her first shot. Chadwick says that he had some private letters from his wife and friends, which he gave to Leisk, the cook, to take care of, and that Leisk gave them up to some of the capturing officers. Leisk says that he had some papers belonging to Chadwick which he (Leisk) put into a teapot, where they were found by the searching officer, and that they were put there by the orders of Chadwick, to keep them out of sight. Nellman says that Chadwick, a few minutes before the capture, gave some papers to Leisk, with directions to put them in a teapot in the galley for the purpose of concealing them, but that they were found by the United States officers. Allen says that he saw a bunch of papers taken out of the teapot by the boarding officer, and that, when they were found, the officer asked Leisk what they were, and Leisk said he thought it was tea. On his re-examination Leisk says that some papers were given to him by Capt. Dyett on the evening of the day they were captured which Capt. Dyett had put at the foot of his berth. Leisk says: "He told me, if he sent for these papers, I should know where to find them. He then went on board the Supply. When he returned, I asked him if he wanted those papers. He said he had already got them. This conversation was between us, there being no other person within hearing. We were in his stateroom at the time, with the door closed." We have no explanation from any witness as to what those papers were. As to the papers which Leisk received from Chadwick and put into the teapot, where they were found by the boarding officer, Leisk says, on his re-examination: "When the first officer handed me those papers he seemed anxious and uneasy, and, when he returned to the schooner to get his clothes,

the first thing he said to me was, 'Have you got those papers?' I told him they were found by the officer. He then said, 'Why in hell did you not destroy them?' and likewise, 'By God, I am done.' "

Three of the papers which were concealed in the teapot, and which Chadwick speaks of as private letters, are letters to Chadwick containing some very important matter. One of them is dated at Bristol, England, October 29, 1861, and is addressed to Chadwick by a person who signs himself "R. H. Leonard, ship Alexander, Confederate States." Leonard expresses his pleasure that he is able to furnish Chadwick with "the book required," without price. He refers to it as a book which Chadwick had written for; says that it belongs to him (Leonard), and that, if it were worth £50, he would willingly give it to an enterprise of Chadwick's, and hopes it may be of valuable service to him. This book is the copy of the United States Coast Survey that was found on board of the vessel, containing charts, as has been seen, for entering very many of the blockaded ports of the enemy. In his testimony, given on his re-examination, Chadwick refers particularly to this book of charts as one which he recommended to his employers to purchase, and which they told him to purchase at any price. He says that he obtained one, which was presented to him by "R. H. Leonard, the mate of the ship Alexander, then lying in Bristol." These employers, Chadwick states, in his deposition on re-examination, to have been Mr. Hughes, "the commercial Confederate agent for purchasing arms and ammunition for and shipping the same to the Confederate States," William L. Yancey of the United States, a South Carolina captain named Connor, and Mr. Saul Isaac. In the same letter, Leonard says: "Capt. Johnson will mark out the chart; also the route, with some information; also write a letter which he will wish you to deliver or forward. Mrs. Bain will also have a letter for you to take, and forward to Virginia, if you arrive safe. I hope you may be successful. If so, report the old Alexander laying up at Bristol, with the palmetto tree constantly flying, and that her captain and officers are ready to aid the South in any enterprise. Tommy, I will not ask you to disclose the secret of your voyage. Be whatever it may, I believe it is true to the South. My heart and well wishes are with you, hoping you may be successful, and I may hear of the consequences. If that book prove serviceable to you, it will afford me more pleasure than its weight in gold in return. * * * I shall send the book by express this evening. I wish you to write me two or three mails before you put to sea, as Mrs. Bain will have some other letters to send. If you should fail, destroy." Chadwick, on his re-examination, states that he received a letter from Capt. Johnson, of the ship Naomi, of Charleston, S. C., giving him

a description of the entrance to Charleston, and also received from him letters for his wife, and for other persons residing in the "Confederate States." In confirmation of this, we find that another of the three letters, being one dated at Bristol, England, October 29, 1861, and signed "John Johnson, ship Naomi," and addressed to Benjamin H. Chadwick, schooner Stephen Hart, Surrey Canal, London," says: "Mr. Leonard, chief officer of the ship Alexander, and I had some private conversation this morning concerning some things, which I need not now repeat." Johnson then proceeds to give specific directions as to the mode of entering the harbor of Charleston, and adds: "The chart of Charleston harbor, in the book called the 'United States Coast Survey,' will be your best guide." He also says: "Enclosed is a letter, and I beg that you will, in case you succeed in safely reaching any Southern port, forward the same to its destination. At the same time, do not let its encumbrance in any way interfere with your enterprise. Destroy it, if need be; but, if it could be managed to forward it safe to my wife, I should feel very grateful towards you for your kindness. I hope and trust that you will succeed in your undertaking. Observe secrecy by all means, and I can assure you that no information as regards the Stephen Hart's whereabouts or movements shall be gained from me by any one, here or elsewhere. * * * May the God of Justice guide you in safety to your port of destination is the fervent wish of one who loves the South, its institutions, and its people. The remaining one of the three letters is from Leonard, and is addressed "to Mr. B. H. Chadwick, alias Tommy, first officer Stephen Hart," and is written at Bristol, England, but without date. It says, among other things. "Give me the particulars of your voyage, what your cargo consists of, and if you have got any guns on board."

The suppression by Capt. Dyett, until his examination in preparatorio, of the letter of instructions to him from S. Isaac, Campbell & Co., and of the letter from S. Isaac to Helm, and the attempt by Chadwick to conceal the letters from Leonard and Capt. Johnson, are circumstances of great importance, as tending to show the illicit and fraudulent character of the entire transaction connected with this vessel and her cargo, and that Capt. Dyett and Chadwick were concerned in carrying out the unlawful purpose, and endeavored to promote that end by attempting to conceal the evidence which they had in their possession. The spoliation of papers is a strong circumstance of suspicion. 1 Kent, Comm. 157. It is not, however, either in England or in the United States, held to furnish, of itself, sufficient ground for condemnation, but is a circumstance open to explanation. The Hunter, 1 Dod. 480; The Pizarro, 2 Wheat. [15 U. S.] 227. But if the explanation be not prompt and frank, or be weak or

futile, if the cause labors under heavy suspicions, or if there be a vehement presumption of bad faith or gross prevarication, it is ground for the denial of further proof; and the condemnation ensues from defects in the evidence, which the party is not permitted to supply. 1 Kent, Comm. 158; The Pizarro, 2 Wheat. [15 U. S.] 227; Bernardi v. Motteux, Doug. 574, 579, 580. In the case of The Two Brothers, 1 C. Rob. Adm. 131, the master had burned some letters, before capture, which he said were only private letters. Sir William Scott says, in commenting upon that circumstance: "No rule can be better known than that neutral masters are not at liberty to destroy papers, or, if they do, that they will not be permitted to explain away such suppression by saying 'they were only private letters.' In all cases it must be considered as a proof of mala fides; and, where that appears, it is a universal rule to presume the worst against those who are convicted of it. It will always be supposed that such letters relate to the ship or cargo, and that it was of material consequence to some interests that they should be destroyed." In the case of The Rising Sun, 2 C. Rob. Adm. 104, Sir William Scott says: "Spoliation is not, alone, in our courts of admiralty, a cause of condemnation; but if other circumstances occur to raise suspicion, it is not too much to say, of a spoliation of papers, that the person guilty of that act shall not have the aid of the court, or be permitted to give further proof, if further proof is necessary." The withholding by the master of the two letters, in the present case, until his examination, while he gave up to the captors the letter to the British consul at Havana, and as he says, all his own private papers, would have been a complete suppression of the two letters in question, if their production had not been compelled by the stringent character of the standing interrogatories. In the case of The Concordia, 1 C. Rob. Adm. 119, the master withheld his instructions until the time of his examination. Sir William Scott says: "This was certainly incorrect. It is a master's duty to produce all his papers, and, least of all, to withhold his instructions, which are very important papers to be communicated for the interest of both parties." So, also, the concealment by Chadwick of the letters to him, which showed the true character of the enterprise of the Stephen Hart, would have been as effectually a destruction of those papers, for the purposes of this case, if they had not been found upon the search, as if they had been actually thrown into the sea and lost. And the suspicion which the law attaches to a spoliation of papers arises with equal force from an attempted spoliation.

That Capt. Dyett and all his crew knew of the blockade of the enemy's ports is abundantly established by the evidence. Nellman says that "all on board knew that the Southern States, including Florida, were in a state of war with the United States, and the South-

ern ports blockaded by the United States navy. It was a matter of conversation on board during the voyage." Capt. Dyett says: "I knew of the Rebellion in the Southern States, and that some of the Southern ports were blockaded." Capt. Dyett says that the vessel was steering for Cardenas when she was captured, and that her course was not altered upon the appearance of the capturing vessel. Chadwick, on his first examination, says the same thing. Nellman says that, when they first saw the capturing vessel, about 6 o'clock in the morning, the Stephen Hart was standing towards Key West, and continued on that course until about 12 o'clock, when she tacked and steered towards Havana, and was steering towards Havana when captured; that their course, at all times when wind and weather permitted, was towards Cardenas, except in the instance mentioned, and except when obliged to pursue another course on account of head winds; and that the latter was the reason why the vessel was steering towards Havana at the time of her capture. Nellman says that he had the watch when the capturing vessel was first seen, and that Chadwick had the watch from 8 a. m. until noon, and he (Nellman) again from noon to 4 o'clock. Nellman and Allan say that the capture was made about 2 o'clock p. m. Although Capt. Dyett, and Chadwick on his first examination, say that the course of the vessel was, at all times when wind and weather would permit, towards Cardenas, yet it is apparent that she set out from England with the intention of running the blockade if she could, and she was captured in a position consistent with that intention.

The evidence which has been reviewed establishes, beyond reasonable doubt, that the cargo of the Stephen Hart was intended, on its departure from England, to be carried into the enemy's country, for the use of the enemy, by a violation of the blockade of some one of the enemy's ports, either in the Stephen Hart or in another vessel into which the cargo was to be transshipped, for the purpose of being transported by sea to the enemy's country. This is clearly established without the aid of the testimony given by Chadwick on his re-examination. Some portions of that testimony have been incidentally alluded to. The other main facts detailed by Chadwick on his re-examination are entirely consistent with all the rest of the evidence in the case, and are corroborated by that evidence. Some of the points of corroboration have been already alluded to, and I shall refer to others. Chadwick says, on his re-examination: "The vessel was bound to Cardenas, in Cuba, but the destination of her cargo was certainly to one of the Confederate States; and the vessel was, in like manner so destined, if Charles J. Helm, the Confederate agent at Cuba, should so direct. That voyage began in London, and was to have ended at Cardenas or any port in the Confederate States which the aforesaid Con-

federate agent should direct." He also says: "The vessel was steering for Cardenas, but that port was to be used only as an intermediate port of call, and of transshipment of the cargo, if necessary or ordered by Charles J. Helm." He also says that, after he had gone in the vessel, then called the "Tamaulipas," from New Orleans, by the way of Havana and Matanzas, to Falmouth and Bristol, England, and thence in the same vessel to London, he was requested to go to No. 71 Jermyn street, London. He adds: "I accordingly went, and was there introduced to Mr. Isaac, the head of the firm of Isaac, Campbell & Co., and also to a Mr. Hughes, whose first name I did not learn, and who told me he was commercial Confederate agent for purchasing arms and ammunition for, and shipping the same to, the Confederate States. He asked me how I would like to run the blockade of the Southern states in the Stephen Hart. I answered 'that I would sooner go in a steamer.' There was no definite arrangement made at that time. I was again sent for, and went to the same place, where I met Mr. Isaac, the same Capt. Hughes, and William L. Yancey, of the United States. There was also a South Carolina captain there. I was taken by Capt. Hughes and this South Carolina captain (whose name was Connor), into another room, and there fully examined in regard to my knowledge of the southern coast of the United States. I was then employed by Capt. Hughes as a pilot agent, and to leave the Stephen Hart and go on board a steamer which he had chartered, and which was then taking a cargo of arms and ammunition for the Confederate States. I was to leave the Stephen Hart, go ashore and take lodgings, and observe secrecy until I was called, which I did. About a week afterwards I was told to go on board of the steamer Gladiator, then lying in the Thames, and examine and see if she had proper boats for landing her cargo in the surf on the southern coast, if required, and report to Hughes. I did so, and reported that she had, with the exception of one boat. I was then ordered to take my things on board of that vessel (the Gladiator), and proceed in her to Nassau, and there either obtain a pilot for her, or else pilot her myself into some southern port of the Confederate States between Cape Canaveral, in Florida, and York river, Virginia. I went aboard accordingly. That vessel was loaded with arms, ammunition, and army outfits. After I got aboard, it was found that she could not carry all the cargo which had been bought for her, and, accordingly, what portion thereof could not be taken by the Gladiator was put aboard the Stephen Hart, together with other like cargo to fill her up. I was ordered to proceed from the Gladiator and take charge of the loading and fitting out of the Stephen Hart, which I did. On my recommendation to Capt. Hughes, Capt. Dyett was appointed master of the Stephen Hart, while I was to go in her nominally as mate, but really in charge of the cargo, consisting of arms and munitions

of war. The vessel proceeded down the Thames several miles, and there took aboard a quantity of powder." Nellman testifies to the same effect as to the place where the powder was taken on board. Chadwick proceeds: "Before the Stephen Hart left, I was instructed by Capt. Hughes to proceed to Cuba, that is, to Cardenas, and there to work under the instructions of Charles J. Helm, the agent for the 'Confederate States' at that place. He said the cargo was to be transshipped into a steamer, which could be used with greater facility in running the blockade, or she might be ordered to proceed herself." The connection of Hughes with the transaction, and his being an agent for "the Confederate States," and the lader of the cargo on board the Stephen Hart, are also testified to by Nellman. The contents of the letter of instructions to Capt. Dyett confirm all that Chadwick says, on his re-examination, as to the connection of Helm with the matter, and as to the certain destination of the cargo and the contingent destination of the vessel being to a port of the enemy. It is stated by Nellman that he heard Chadwick say that the cargo was going to the enemy's country, and that a steamer would receive it at Cuba, very probably, and would carry it thence to a port of the enemy. And it is apparent, from what Nellman says, that it was understood, on board of the Stephen Hart, that the cargo was destined for a port of the enemy, and was to be carried there in that vessel, or to be transshipped to another vessel for the same purpose. Chadwick proceeds: "The agreement was that I should have $45 a month for all the time I was employed, including any time I might be detained or imprisoned, in consequence of any attempt to run the blockade; and if I had gone in the Gladiator I was to have received a bounty of $500; and, in the Stephen Hart, if ordered by Helm to cross the blockade, I was to have a bonus, to be agreed upon with him." The shipping articles confirm this statement of Chadwick's to a certain extent, as they show that his wages were to be £9 per month. They also show that the wages of the mate, whose place he took, were only £6 per month. He then goes on to state, what he had already stated in his affidavit upon which the order for his re-examination was made, that he was induced to state these facts, not by any persons in any way connected with the libellants or captors, but solely by the persuasion of his wife, "who is a loyal woman, and now residing in Boston." The absence from on board of the Stephen Hart of the bills of lading and manifest, to whose existence the master testifies, and of all invoices of the cargo, has been already referred to. The absence of these papers, in time of war, is a suspicious circumstance, as affecting the question of the neutrality of the cargo and the honesty of the trade. 1 Kent, Comm. 157; Halleck, Int. Law, p. 622, c. 25, § 25.

It has been strongly urged upon the court,

in the present case, that as Harris, the alleged owner of the vessel, is not shown to have any interest in any of the cargo, the vessel can be visited with no greater penalty of carrying contraband articles, even though they were intended for the enemy, than the loss of freight and expenses. But, even on the assumption that the grounds already set forth in respect to the real ownership of the vessel are not sufficient for her condemnation, the court is of opinion that her condemnation must, under the circumstances, follow the condemnation of the cargo, the latter being contraband of war, and intended, on its departure from England, to be carried into the enemy's country by a violation of the blockade. The contingent destination of the vessel to a blockaded port would be sufficient, under the authority of the case of The Richmond, before cited, to warrant her condemnation. But, even if her destination was only to Cardenas, yet, as her cargo was intended, on its departure from England, to be introduced into the enemy's country, by being transshipped from the vessel at Cardenas, condemnation must equally follow, because of the employment of the vessel in this unlawful enterprise, under the circumstances disclosed in this case. As testified to by Capt. Dyett, there was no charter party for the voyage. He says that he was put in charge of the vessel, not by Harris, her alleged owner, but by S. Isaac, Campbell & Co., the claimants of the cargo. No instructions from Harris to Capt. Dyett are found, but only instructions to him from S. Isaac, Campbell & Co. Harris, therefore, surrendered the entire control of his vessel to that firm, and her master must be regarded as her agent, and the claimant of the vessel must be held responsible for the use to which the master and the claimants of the cargo put the vessel. Jecker v. Montgomery, 18 How. [59 U. S.] 110, 119. That use was the carrying, for a portion of the distance on its way to the enemy's country, of a cargo contraband of war, intended for the use of the enemy, and to enter the enemy's port by a violation of the blockade. This use of the vessel was, under the authorities before cited, unlawful in its inception, and, the entire transportation of the cargo from England to the enemy's country being unlawful, the vessel must be condemned for having been permitted by Harris to be used, at the pleasure of S. Isaac, Campbell & Co., in carrying out a portion of the unlawful purpose. Such use was, under the circumstances, in judgment of law, with the knowledge and assent of Harris. Chadwick, on his re-examination, states that Harris wished him to continue in the Stephen Hart as mate; "that either she would go to, or else he would put me on board of another vessel to go to, the Confederate States."

In the case of The Ringende Jacob, 1 C. Rob. Adm. 89, Sir William Scott says that, under the ancient law of Europe, the carry-

ing of a contraband cargo rendered the vessel liable to condemnation; but that, in the modern practice of the courts of admiralty of England, a milder rule has been adopted, and that the carrying of contraband articles is attended only with the loss of freight and expenses, "except where the ship belongs to the owner of the contraband cargo, or where the simple misconduct of carrying a contraband cargo has been connected with other malignant and aggravating circumstances." And he cites, as an exception, a case attended with particular circumstances of falsehood and fraud, both as to the papers and destination of the voyage, and in which there was an attempt, under colorable appearances, to defeat the rights of the belligerent. The same doctrine is laid down in the case of The Jonge Tobias, Id. 329. In the case of The Franklin, 3 C. Rob. Adm. 217, a neutral vessel, ostensibly bound to a neutral port, and whose cargo consisted of several articles which were contraband if going to the enemy, was held, by Sir William Scott, to have been captured while really on her way to a port of the enemy. He says: "I have had frequent occasion to observe that it is very difficult to detect a fraud of this species in the particular instances. Pretences and excuses are always resorted to, the fallacy of which can seldom be completely exposed; and therefore, without undertaking the task of exposing them in the particular case, the court has been induced (and I hope not unwarrantably) to hold generally, in each case, that the certain fact shall prevail over the dubious explanations. I am satisfied, on the facts of this case, that it was the plan of the voyage to carry the ship fraudulently, under a false destination, into a Spanish port. The consequences will be, that this fraudulent conduct, on the part of those who are concerned in the ship, will justly subject her to confiscation. Anciently, the carrying of contraband did, in ordinary cases, affect the ship, and, although a relaxation has taken place, it is a relaxation the benefit of which can only be claimed by fair cases. The aggravation of fraud justifies additional penalties." He then announces it as the settled rule of law "that the carriage of contraband, with a false destination, will work a condemnation of the ship as well as the cargo." In that case the owner of the ship was not the owner of the cargo, but, being himself a neutral, had entered into a charter party for a voyage of the vessel from one neutral port to another neutral port. In a note to the case, these very appropriate remarks are made: "The relaxation of the old rule has been directed, in its practical application, as well as in its origin, only to such cases as afford a presumption that the owner was innocent, or the master deceived. Where the owner is himself privy to the transaction, or where his agent interposes so actively in the fraud as to consent to give additional cover

to it by sailing with false papers, all pretence of ignorance or innocence is precluded, and there seems to be no further ground, consistent with equity and good sense, upon which the relaxation in favor of the ship can any longer be supposed to exist." The same principles are laid down in the cases of The Mercurius, 1 C. Rob. Adm. 288; The Edward, 4 C. Rob. Adm. 68; and The Neutralitet, 3 C. Rob. Adm. 295. In the latter case, Sir William Scott says, that, where a vessel is carrying contraband articles under a false destination or false papers, those circumstances of aggravation constitute excepted cases out of the modern rule, and continue them in the ancient one. In The Ranger, 6 C. Rob. Adm. 125, which was the case of an American vessel with a cargo which was documented for a neutral port, but was going to the enemy's port, and was condemned as contraband, Sir William Scott says: "I also condemned the vessel, as employed in carrying a cargo of sea stores to a place of naval equipment, under false papers. It is described, I perceive, as an American vessel. But, if the owner will place his property under the absolute management and control of persons who are capable of lending it, in this manner, to be made an instrument of fraud in the hands of the enemy, he must sustain the consequences of such misconduct on the part of his agent." In The Oster Risoer, 4 C. Rob. Adm. 199, Sir William Scott held that a master could not be permitted to aver his ignorance of the contents of contraband packages on board of his vessel; that he was bound, in time of war, to know the contents of his cargo; and that, if a different rule could be sustained, it might be applied to excuse the carrying of all contraband.

One important circumstance, to show that the cargo of the Stephen Hart was intended for the enemy, is the fact that a part of it consisted of 90,000 buttons, marked with the initials "C. S. A.," which, it is well understood, stand for the words "Confederate States of America," or "Confederate States Army," the buttons being such as are used on army clothing for the three services of an army.

This review of the facts in this case leads to the conclusion that the vessel and her cargo must both of them be condemned. No doubt is left upon the mind that the case is one of a manifest attempt to introduce contraband goods into the enemy's territory by a breach of blockade, for which the vessel must be held liable to forfeiture as well as her cargo. Chadwick was evidently employed by reason of his being a citizen of the United States, familiar with the enemy's country, and qualified to conduct the vessel into one of the blockaded ports. The vessel was captured in a position convenient for running the blockade. The cargo consisted of arms, munitions of war, and military equipments, and, among them, a large quantity of

military buttons, stamped in such a manner as to render them capable of no appropriate use save for the infantry, cavalry, and artillery of the enemy's army, thus showing that the enemy's country was their only appropriate destination. The absence of the manifest and bills of lading is not satisfactorily accounted for, and the want of any invoices and of any charter party is a circumstance of great weight against the lawfulness of the commerce. The attempt, by the master, to suppress his letter of instructions, and the letter to Helm, the agent of the enemy in Cuba, and the attempt of the mate to conceal the letters which show that the design was that the Stephen Hart should, under his guidance, enter a blockaded port of the enemy, and which also contain specific directions for entering the harbor of Charleston, justify the conclusion that Charleston, or some other port of the enemy, was the real destination of the vessel and her cargo. The absence of any charter party, and of any instructions from Harris to Capt. Dyett, and the entire surrender by Harris of the control of the vessel to the laders of the cargo, and to the master as their agent, involve the vessel in all the guilt which attaches to the cargo. The object of carrying the flag of the enemy could only have been that it might be used for the purpose of entering the enemy's port,—a conclusion strengthened by the fact that it was thrown overboard at the time of the capture. The charts found on board are charts of such a character as to enable a vessel to enter many of the blockaded ports. The letter concealed by the mate, which contains directions for entering the harbor of Charleston, is one which he had a motive to preserve by concealing, and not to destroy, because, upon the regular papers of the vessel, he must have indulged the hope that she would have been permitted, after a search, to proceed upon the voyage indicated by her papers, and thus that the letter in question would afterwards become useful on a further voyage to the port of the enemy. There is an absence of all papers and circumstances to warrant the conclusion that there was any intent to dispose of the cargo at Cardenas, in the usual way of lawful commerce. The consignee of the entire cargo was the agent of the enemy, and the cargo was laden on board by the agent of the enemy in London. The asserted ignorance of the master as to the contents of his cargo, and as to the fact that arms are contraband of war, and the ambiguous destination set out in the shipping articles, are circumstances which, with many others, go to swell the volume of suspicion attached to the enterprise. In addition to all this, there is the positive evidence which has been referred to, particularly of Chadwick and Nellman, as to the actual destination of the cargo. All the material facts of the case, which lead to a condemnation, are proved without any resort to the re-examination either of Leisk or of Chadwick.

This is not a case for further proof, and no application has been made on the part of the claimants to supply any further proofs as to any point. There must, therefore, be a decree condemning both vessel and cargo.

[An appeal was taken to the supreme court from this decree, and it was there affirmed. 3 Wall. (70 U. S.) 559.]